# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ROBERT PATRICK BONEFANT, JR.,**                         Chapter 7
and **MARGARET LOUISE McCLORY-**                          Case No. 12-16482-JNF
**BONEFANT**,
          Debtors

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**STEWART F. GROSSMAN,**
**CHAPTER 7 TRUSTEE**,
          Plaintiff,
v.                                                        Adv. P. No. 14-1143
**ROBERT PATRICK BONEFANT, SR.,**
          Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

# MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed by Stewart F. Grossman, the

Chapter 7 Trustee of the bankruptcy estate of Robert Patrick Bonefant Jr. (the "Debtor")

and Margaret Louise McClory-Bonefant (collectively, the "Debtors"), against the

Debtor's father, Robert Patrick Bonefant, Sr. (the "Defendant").  Through his Complaint,

the Trustee seeks "to avoid fraudulent transfers arising from payments by the Debtor to

or for the benefit of the Defendant while the Debtor was insolvent and for which the

Debtor received no reasonably equivalent value, for unjust enrichment, and for a

1

resulting trust." Specifically, the Trustee set forth four counts in his Complaint as follows:

Count I (Fraudulent Transfer - - 11 U.S.C. § 548); Count II - - (Fraudulent Transfer - - 11

U.S.C. § 555(b)); Count III - - (11 U.S.C. § 550(a)(1)); Count IV - - (Quantum Meruit/Unjust

Enrichment); and Count V - - (Resulting Trust). The Defendant filed an Answer, and the

parties filed a Joint Pretrial Memorandum in accordance with the deadline set forth in the

Court's pretrial order dated August 14, 2014, as extended multiple times by the Court at

the parties' requests. In his Answer, the Defendant did not raise an affirmative defense

under 11 U.S.C. § 548(c).[1]

In their Joint Pretrial Memorandum, the parties agreed that the Trustee's

Complaint is within the jurisdiction of this Court pursuant to 28 U.S.C. § 1334; that it

arises under and relates to a case under Title 11 of the United States Code; and that it is a

"core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(H). In addition, the parties expressly

consented to the entry of a final order by this Court.

On January 20, 2016, this Court conducted a trial at which three witnesses testified

and 63 exhibits were submitted into evidence. At the conclusion of the trial, the Court

noted that "Counsel to the Chapter 7 Trustee waived Count II of the Complaint on the

---

[1] Section 548(c) provides:

> Except to the extent that a transfer or obligation voidable under this section
> is voidable under section 544, 545, or 547 of this title, a transferee or obligee
> of such a transfer or obligation that takes for value and in good faith has a
> lien on or may retain any interest transferred or may enforce any obligation
> incurred, as the case may be, to the extent that such transferee or obligee
> gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

2

record and limited his request for relief to payments made to the Defendant by the Debtor within the two-year period prior to the filing of the Debtor's petition." The Court also issued the following order:

> The parties agreed to introduce portions of the Debtor's deposition into evidence in lieu of his appearance at the trial due to his inability to attend the scheduled trial. The Court directed counsel to electronically file their respective Designation of Deposition Testimony of the Debtor. . . . The parties shall file post-trial briefs by February 23, 2016.

The issues presented are whether the Trustee sustained his burden of proof on the remaining counts of his Complaint and, if so, what are his damages.

## II. FACTS

### A. Admitted Facts

The Debtors filed a joint Chapter 7 petition on August 1, 2012. At all times between August 1, 2010 and August 1, 2012, the Debtor was insolvent. On Schedule A-Real Property, he listed an interest in 4 Juniper Lane, Topsfield, Massachusetts with a value of $622,223, and, on Schedule D-Creditors Holding Secured Claims, he disclosed the existence of two mortgages encumbering the property totaling $211,392, both held by "Salem Five."

On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor identified the following creditors holding unsecured non-priority claims in the amounts indicated:

| | |
|---|---|
| Cummings Properties, LLC | $215,654.00 |
| Internal Revenue Service | $240,000.00 |
| Massachusetts Dept. of Revenue | $35,000.00 |

Cummings Properties, LLC ("Cummings") is the holder of a judgment against the Debtor in the amount of $215,654.00 issued by the Woburn District Court in an action commenced in 2004 (Case No. 0453SU0220).  The Debtor's debt to the Internal Revenue Service is the result of the Debtors' federal income tax liability for tax years 2004 and 2005, and the Debtor's debt to the Massachusetts Department of Revenue is the result of the Debtors' state income tax liability for the same tax years.[2]

Between 2009 and March of 2012, the Debtor was employed by Signeo USA, LLC, a company headquartered in Florida.  Between 2009 and at least January of 2012, the Debtor received regular payments from Signeo USA, which included salary, profit sharing and reimbursement of business expenses.  The Debtor, with the consent of the Defendant, deposited payments received from Signeo USA into the checking and/or savings accounts of the Defendant held at Salem Five Savings Bank. The Debtor began this practice in 2009 and it continued through at least February, 2012.  Beginning on or before 2009 and continuing through August 1, 2012, the Debtor used a Chase credit card account in the name of the Defendant and his spouse, Mary Bonefant, and incurred charges on that account for his own benefit.

---

[2] *The Court may take judicial notice of its own docket. See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").  The Court notes that the Debtors did not list the Debtor's father, Robert Patrick Bonefant, Sr. or the Debtor's mother, Mary Bonefant, as creditors on Schedule F.

B. <u>The Debtor's Criminal Prosecution</u>

The United States Attorney, on July 28, 2015, filed an eight count Information against the Debtor in which she alleged violations of 26 U.S.C. § 7201 (Tax Evasion); 26 U.S.C. § 7206(1) (Filing False Tax Return); 18 U.S.C. § 152(3) (Bankruptcy Fraud – False Statement); 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (Criminal Forfeiture Allegation).[3]  In the Information, the U.S. Attorney indicated that the Debtor was the owner and manager of AVC Technology Systems, Inc. According to the U.S. Attorney, that company held minority ownership interests in Signeo International Ltd., a Hong Kong entity engaged in the manufacture and sale of electronic products and Signeo USA, LLC, a limited liability company registered in Florida to provide marketing and administrative services to Signeo International Ltd.

In the Information, the U.S. Attorney set forth three counts for bankruptcy fraud, referencing the Debtor's failure to list on Schedule B-Personal Property any stock or interests in the foregoing entities (Count VI); the Debtor's failure to disclose income received "from employment, trade, or profession, or from operation of the debtor's business" on the Statement of Financial Affairs (Count VII); and his failure to disclose all financial accounts held in the name of the Debtor or for the benefit of the Debtor which

---

[3] According to the website for the Offices of the United States Attorneys, https://www.justice.gov/usam/criminal, "[a]n information may be used when the defendant has waived an indictment. *See* this Manual at 209. An information may also be used when the offense charged is punishable by imprisonment for one year or less. *See* <u>Duke v. United States</u>, 301 U.S. 492 (1937); <u>United States v. Brewer</u>, 681 F.2d 973, 974 (5th Cir. 1982)." The Debtor and his counsel waived an indictment in open court on September 13, 2015.

were closed within one year immediately preceding the commencement of the bankruptcy case (Count VIII). The U.S. Attorney specifically identified an account at Salem Five Cents Savings Bank ("Salem Five") in the name of the Debtor's father, the Defendant, into which he had been depositing distributions and fees.

The Debtor pled guilty to all counts in the Information except Counts IV (26 U.S.C. § 7206(1) – Filing False Tax Return) and VII (18 U.S.C. § 152(3) - Bankruptcy Fraud). He was scheduled to be sentenced on December 18, 2015.

C. Facts Adduced at Trial

The Chapter 7 Trustee testified that his investigation of the Debtor's transactions with the Defendant was triggered by his concerns about the ownership of motor vehicles listed by the Debtors on Schedule B, as well as visits from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS"). He learned that the Debtor owned a business that was not disclosed on his Schedules of Assets and that "the [D]ebtor was using . . . his father's bank account and he was depositing his money in his [father's] bank account. According to the Trustee, the Debtor was motivated to enlist the Trustee's assistance because of his belief that he was tricked out of monies from the sale of a company he owned, Signeo, USA, LLC ("Signeo") in Florida.

The Defendant had bank accounts at Salem Five. The name on the accounts was Robert P. Bonefant [the Defendant] or Mary Bonefant. The Trustee examined a combined bank statement, dated August 25, 2010, for a personal checking account[4] and passbook

---

[4] Neither the Trustee nor the Defendant introduced chalks as to activity in the checking account. The checking account reveals that Social Security checks were automatically

savings account and traced Signeo checks made payable to the Debtor, which were endorsed by him and deposited into the passbook savings account.  For example, the Trustee pointed to a deposit made on August 3, 2010 with an accompanying deposit slip in the sum of $27,605.88, comprised of two Signeo checks, less $500, one in the amount of $23,750.00 payable to Robert Bonefant A/V Systems, an entity that received payroll checks on behalf of the Debtor, and the other in the amount of $4,355.88, with a memo "June Exp." Another Signeo check payable to the Debtor in the amount of $3,275 was deposited into the Defendant's account on August 19, 2010.  The memo line on the check indicated that it was for a hotel expense.

The Trustee submitted a chalk summary of the Defendant's passbook savings account showing deposits traceable to checks issued by Signeo to the Debtor or "Robert Bonefant A/V Systems" which totaled $619,682.49.[5]

The Debtor's father is 86-years old.  He testified on his own behalf, referring to the Debtor as his "unfortunate son."  He confirmed that he had both a checking account and a savings account at Salem Five and later an account at Eastern Bank, which he still uses. He indicated that those accounts were joint accounts with his wife Mary, and that he has never had a joint account with his son.

---

deposited into the checking account, and the couple wrote numerous checks and authorized a medical premium payment each month.

[5] There were a few exceptions.  The Trustee indicated that endorsed checks and deposit slips were not available for the October 25, 2010 statement, and the Trustee included two checks, one dated June 22, 2011 and the other July 1, 2011, from Arbella Mutual Insurance Company payable to the Debtors and "Salem Five Mtg Co LLC ISAOA" in the amounts of $24,986.12 and $2,000, respectively.

With respect to the Salem Five checking account, the Defendant indicated that he used the account for deposits from rental properties owned by his spouse, as well as social security income.  He stated that he also used the account to write checks for his personal expenses and for expenses associated with the rental properties.  He testified, however, that he did not examine the bank statements regularly as "[m]ost of the financial part of the business was done by my wife."  He also testified that his daughter had assumed responsibility for the couple's financial affairs over the past year as both he and his wife are legally blind.

The Defendant testified that he was aware that the Debtor deposited payroll and other checks into the Salem Five passbook savings account for several years.  He stated: "We didn't allow him.  We had the same name.  He put it under my account." Nevertheless, he admitted allowing the deposits to continue, stating "Yeah. If I couldn't trust him, who the hell could I trust? Boy, did I make a mistake."  In addition, the Defendant admitted to endorsing and then depositing at least three checks made payable to the Debtor in the amounts of $30,000, $17,000 and $14,000.

While the Defendant admitted depositing three checks, his testimony was less coherent about the Debtor's payroll checks deposited into his savings passbook account for the period of 18-20 months before the Debtor filed his bankruptcy petition.  The Defendant denied that he knew that his son was hiding money when he was depositing it into his account.  Nevertheless, at his deposition which took place on March 18, 2015, the Defendant stated that "he [the Debtor] was hiding money in my account."  He also

testified at his deposition that that circumstance led him, together with his wife, to open an account at Eastern Bank.

The Defendant also testified about a Chase Sapphire MasterCard, which he and his wife used for personal expenses, such as gas, groceries, and meals.  He denied providing the Debtor with a Chase Bank credit card and denied using the card for expenses associated with the rental properties.  He also denied that his son ever asked him to borrow money.  Nevertheless, the Defendant backtracked, testifying that the Debtor did use the credit card account:

> He used it at the time when he came to me, "Dad," he says "Can I use the credit card? I'm unemployed right now. The business folded." And I says, Yeah. I trusted you, "you know, my son. . . . Big mistake. Big mistake. I did. And he must have used it a period of six months, seven months in there, while he was -- then he -- I asked about it. He returned it. He said, "I'm starting work next week. The business is coming back. I'm getting calls." I said, "Fine." So returned it [sic].

Indeed, the exhibits admitted into evidence establish that the Debtor continued to use the card after the filing of his bankruptcy petition as numerous, postpetition charges appear on the card from locations in Nevada and California.  The Defendant specifically testified that he and his wife ceased traveling within the last six or seven years due to health problems.

At the deposition conducted by Defendant's counsel that took place on June 12, 2015, which was introduced into evidence by agreement of the parties, the Debtor testified about his use of the Defendant's bank accounts and the Chase Sapphire MasterCard.  In his testimony, he stated that his father gave him the credit card and that he used it "[f]or years" because his credit was bad and he needed it for travel and

9

expenses. He explained that he began using the card in 2007 and 2008 and returned it to his parents in July of 2012 when they came to his house and asked for it back. He stated that he had an understanding with his father that he would pay "all of it, and whatever he charged on it," adding I would also pay using - - there were two names. One was my mother's name. And one was his name that I used." The Debtor further testified that he would obtain a cashier's check or write a check from his father's passbook savings account to pay the credit card bill each month. The Debtor thought there was a balance on the card of approximately $8,000 when he allegedly returned it, although he did not list his parents as creditors on Schedule F. In view of the charges on the card in 2014, the Court discredits the Debtor's testimony as to when he ceased to use the card.

The Debtor stated that he believed his parents' charges averaged about $500 per month, although sometimes his parents would use the card to buy appliances for rental properties or pay for car repairs. The Debtor testified that his charges varied depending upon his travel schedule. He stated that he traveled to China and "all over the world basically," and, when he did so, he used the credit card for all his expenses, including airfare, hotels, and food. The Debtor also represented that he was a Florida resident in 2011 and was home in Massachusetts for only about 90 days. He used the credit card for travel between Florida and Massachusetts and was reimbursed by Signeo.

With respect to the use of the Defendant's bank accounts, the Debtor indicated that as a result of a substantial judgment obtained against him by Cummings Properties his counsel advised him to conceal his income in an account which did not reflect his name or Social Security number.

10

The Debtor testified that he deposited funds into the passbook savings account beginning in 2007 or 2008 and withdrew cash from the account to pay mortgages on his home and other bills.  One or the other of his parents would withdraw cash or would sign withdrawal forms, and the Debtor would then use the cash to pay the mortgages. His wife had a checking account in her name and some of the cash was deposited into that account to pay household bills. He testified that when he was working for Signeo he was depositing about $12,000 each month into his parents' passbook savings account, adding that he was withdrawing "[s]ome months less, a lot less.  Some months more." The Debtor kept track of the deposit slips, but did not save them.  He rationalized that "there was always more in there than I was taking out at the time."   The Debtor also testified at his deposition that his father told a bookkeeper that he had withdrawn at least $160,000 to pay for repairs to rental properties.

On cross-examination, the Defendant exhibited confusion about the Debtor's use of the couple's joint passbook savings account.  He maintained that the Debtor did not ask his permission to use the account, stating "I don't know a thing about it, unless he went to my wife."   He further denied knowledge of any debts his son owed, denied knowing that the Debtor testified that he was using the Defendant's account to hide income from his spouse, and denied knowing why he wished to use his bank account for that purpose.  Nevertheless, he added: ". . . I had a lot of faith in my children and what he wanted to do, he did. If he said it was okay, I'd say, "Yeah, go ahead and do it."

The Debtor's sister, Stephanie Bonefant Hooper ("Hooper"), testified as she is now responsible for her parents' finances because, as noted above, both are legally blind.  She

testified that she pays their monthly bills, including utilities and the Chase Sapphire MasterCard bill. She testified that the Debtor used both her parents' checking and savings accounts and that she was aware that he used their credit card for charges for travel, cell phones and the like. She testified that she opened the statements and paid the monthly credit card bill from her parents' account. When she learned that the Debtor was using the Salem Five passbook accounts she testified that she put a stop to transactions he was making by closing the accounts and caused her parents to open a Money Market account and a checking account at Eastern Bank. The Debtor, however, continued his practice of using the Defendant's Money Market account at Eastern Bank to deposit large checks and to make cash withdrawals. In addition, money was transferred from the Money Market account to the checking account to pay credit card bills.

Hooper indicated that she did not discern any payments related to renovations of rental properties in her parents' Salem Five accounts. She also testified that she did not see anything related to the rental properties on the credit card statements as the charges they incurred were limited to routine expenses. Hooper admitted, however, that she did not assume full responsibility for her parents' finances until October of 2014 and, although she reviewed some credit card statements, her parents were still involved in writing checks for months. In addition, Hooper testified that she did not examine her parents' Salem Five bank statements regularly in the period from 2010 through 2012, only reviewing them after the fact for tax purposes. Hooper, nevertheless, insisted that she was very much aware of her parents' spending habits and could accurately differentiate

their expenditures from the Debtor's expenditures, even though she had no personal knowledge of his spending habits.  With respect to her parents, she stated:  "I have intimate personal knowledge of what my parents do. . . . I've been their caretaker."  In addition, in reviewing the bank account statements, she attributed large withdrawals to the Debtor and smaller ones to her parents.  Indeed, the Defendant testified that he did not make large cash withdrawals from his accounts for his personal uses and generally carried about $50 in cash in his pocket.  He also testified that he generally did not use cash for purchases or services costing more than $500, and Hooper testified that her parents, if they had expenses associated with rental properties, paid suppliers or contractors by check.

Hooper reviewed the Salem Five and Eastern Bank account statements and prepared a chalk for the Salem Five passbook savings account and the Eastern Bank Money Market Account.  The chalk set forth deposits and withdrawals attributable to her parents and deposits and withdrawals attributable to the Debtor.  She testified that the Debtor caused deposits and withdrawals into and out of the Salem Five passbook savings account and Eastern Bank Money Market account of $773,944.50 and withdrew $761,622.80, respectively.[6]

---

[6] At trial, Hooper was asked to testify about these totals.  She was given a short time to tally the figures.  Her testimony was incorrect.  The parties in their post-trial submissions substantially agreed to the numbers set forth in the text, except as noted below.

### III. POSITIONS OF THE PARTIES

A. <u>The Trustee</u>

The Trustee's argument is two-fold.  In the first place, he interprets the evidence to provide the following, using the Defendant's chalk:

| Period | Bank | Amounts Deposited | Amounts Withdrawn | Cash Withdrawn |
|--------|------|-------------------|-------------------|----------------|
| 8/1/10-12/31/10 | Salem Five | $180,971.40 | $151,119.80 | $48,000 |
| 1/1/11-12/31/11 | Salem Five | $413,470.30 | $409,098.40 | $180,234 |
| 1/1/12-2/28/12 | Salem Five | $47,184.00 | $69,675.09 | $24,000 |
| 2/1/12-7/31/12 | Eastern Bank | $132,318.80 | $132,029.50[7] | $11,800 |
| **TOTAL** | | **$773,944.50** | **$761,922.79** | **$264,034** |

Thus, according to the Trustee, "[b]ased on the Defendant's own evidence, therefore, and without taking account any of the discrepancies discussed below, the Defendant admits that the Debtor deposited $12,022 more than were purportedly spent for the Debtor's benefit."  The Trustee adds, however, that "the actual amount of funds of the Debtor deposited into the Defendant's bank accounts without proof of a corresponding use for the Debtor's benefit is significantly larger."  He, thus, concludes

---

[7] The Trustee included in this sum a $300 withdrawal that occurred on August 6, 2012. The Defendant included this withdrawal in his original chalk, but not in the revised chalk attached to his post-trial brief.  Accordingly, the correct number should be $131,729.45.  Thus, according to the Defendant, the Debtor deposited $12,321.69 more that what was withdrawn.  Thus, the revised chalk submitted by the Defendant does not prejudice the Plaintiff.

that he is entitled to the amount of cash withdrawn from the passbook savings and Money Market accounts, totaling $264,034 because "there is no reliable evidence that these cash withdrawals were actually used for the benefit of the Debtor."  Moreover, he seeks $10,605.52 in payments made by the Debtor with transferred funds for the period between August 1, 2010 and August 1, 2012, for the credit card charges made by the Defendant and his wife on the Chase Sapphire MasterCard.  The Court, however, cannot duplicate with precision how the Trustee derived his figures, particularly where the Court was asked to disregard handwritten notes on the credit card bills.

The Trustee argues that the holding in Lassman v. Patts (In re Patts), 470 B.R. 234 (Bankr. D. Mass. 2012)("While section 550(d) is typically implicated in situations where a trustee seeks recovery from multiple parties, this provision has also been used to 'prohibit a trustee from recovering under [s]ection 550(a) from a transferee that has already returned to the estate that which was taken in violation of the Code.'" Bakst v. Wetzel (In re Kingsley), 06–12096–BKC–PGH, 2007 WL 1491188, *3 (Bankr. S.D. Fla. May 17, 2007), aff'd, 518 F.3d 874 (11th Cir. 2008)(quoting Dobin v. Presidential Fin. Corp. of Delaware Valley (In re Cybridge Corp.), 312 B.R. 262, 271 (D. N.J. 2004))."), should not apply in this case.  He urges this Court to reject the Defendant's argument that the bankruptcy estate suffered no loss and, therefore, is not entitled to any recovery under 11 U.S.C. § 550 because the amount of the transfers by the Debtor to the Defendant in the two years before the petition date was exceeded by the amounts returned to the Debtor from the Defendant's bank accounts. He states:

The problem with such an argument is that it entirely reads out of the Bankruptcy Code the provisions that create a defense to a fraudulent transfer action for a defendant who gives value back to a debtor and acts in good faith. Under 11 U.S.C. § 548(c), a transferee has a defense if he "takes for value and in good faith". Similarly, under 11 U.S.C. § 550(b)(1), a transferee of the initial transferee has a defense if he "takes for value . . ., in good faith, and without knowledge of the voidability of the transfer avoided." If, however, the giving of value back to the estate is itself a complete defense, then the additional elements of § 548(c) (good faith) and § 550(b)(1) (good faith and lack of knowledge of voidability) become superfluous and irrelevant. Such a statutory reading is contrary to the "time-honored tenet that all words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant, or superfluous." Lopez–Soto v. Hawayek, 175 F.3d 170, 173 (1st Cir. 1999).

B. The Defendant

The Defendant urges the Court to equitably adjust the amount of the alleged fraudulent transfers by crediting the amounts of money that the Debtor withdrew from the Salem Five passbook savings account and the Eastern Bank Money Market account (or checks written on his behalf) to make his mortgage payments or to satisfy business related and living expenses, whether directly from the accounts, or indirectly in the form of payment of the Chase Sapphire MasterCard.  In the Defendant's view, this approach restores the estate to the financial condition that would have existed had the transfers not been made.

IV. DISCUSSION

A. Applicable Law

Section 548 provides:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the

16

debtor in property, or any obligation (including any obligation to or for the
benefit of an insider under an employment contract) incurred by the debtor,
that was made or incurred on or within 2 years before the date of the filing
of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent
to hinder, delay, or defraud any entity to which the debtor was or became,
on or after the date that such transfer was made or such obligation was
incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange
for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or
such obligation was incurred, or became insolvent as a result of such
transfer or obligation;

11 U.S.C. § 548(a).  Section 550 provides in pertinent part: "(a) Except as otherwise

provided in this section, to the extent that a transfer is avoided under section 544, 545,

547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the

estate, the property transferred, or, if the court so orders, the value of such property,

from-- (1) the initial transferee of such transfer or the entity for whose benefit such

transfer was made." 11 U.S.C. § 550(a)(1).   "The trustee is entitled to only a single

satisfaction under subsection (a) of this section." Id. at § 550(d).  "Section 548 and Section

550 are separate Code provisions that provide different forms of relief. Indeed, the relief

afforded by Section 550 is available only if the pertinent transfer is first avoided under

Section 548 or one of the other avoidance sections it references." Meoli v. The Huntington

Nat'l Bank (In re Teleservices Group, Inc.), 444 B.R. 767, 791 (Bankr. W.D. Mich. 2011).

In Lassman v. Patts (In re Patts), 470 B.R. 234 (Bankr. D. Mass. 2012), this Court,

distinguishing between avoidance and recovery, determined that the transfer the trustee

sought to avoid had already been undone and that the undiminished value of the

transferred asset had been restored. Id. at 243. This Court observed:

> "While section 550(d) is typically implicated in situations where a trustee
> seeks recovery from multiple parties, this provision has also been used to
> 'prohibit a trustee from recovering under [s]ection 550(a) from a transferee
> that has already returned to the estate that which was taken in violation of
> the Code.'" Bakst v. Wetzel (In re Kingsley), 06–12096–BKC–PGH, 2007 WL
> 1491188, *3 (Bankr. S.D. Fla. May 17, 2007), aff'd, 518 F.3d 874 (11th Cir.
> 2008)(quoting Dobin v. Presidential Fin. Corp. of Delaware Valley (In re
> Cybridge Corp.), 312 B.R. 262, 271 (D. N.J. 2004)).

In re Patts, 470 B.R. at 243.  See also Ray v. Garland (In re Martin), No. 08-52631, Adv. No.

10-5059, 2011 WL 6130422 (Bankr. E.D. Tenn. Dec. 8, 2011).  In Kapila v. SunTrust Mortg.

(In re Pearlman), 515 B.R. 887 (Bankr. M.D. Fla. 2014), the court explained:

> "The power of the trustee to avoid certain transfers prevents the depletion
> of the estate, promotes an equitable distribution of the debtor's assets, and
> protects creditors who advanced credit in ignorance of fraud." Consistent
> with these aims, § 550(d) states that a trustee "is entitled to only a single
> satisfaction under subsection (a) of this section." This "single satisfaction
> rule" seeks to limit the trustee to a single recovery for his or her fraudulent
> transfer claim to ensure the bankruptcy estate is put back in its pre-transfer
> position but receives no windfall through the avoidance provisions.
> Application of § 550(d) is a matter of federal common law.
>
> Section 550(d) typically is used to prevent a trustee from collecting from
> multiple parties for the same transfer, i.e., an initial transferee and a
> subsequent transferee. Courts also use § 550(d) however to temper the
> harsh application of § 550(a) when the estate already has received full
> repayment of the challenged transfers before the bankruptcy case was filed.
> These decisions rely on the principle that § 550 "is designed to restore the
> estate to the financial condition that would have existed had the transfer
> never occurred." The crux of the argument holds that if the bankruptcy
> estate receives prepetition repayment of fraudulent transfers, then the
> estate, at filing, is in the same position it would have been in
> notwithstanding the transfers.

515 B.R. at 896-97 (footnotes omitted).

B. <u>Analysis</u>

At the outset, the Court observes that the Trustee did not address either Count IV - - (Quantum Meruit/Unjust Enrichment) or Count V - - (Resulting Trust). Accordingly, the Court deems those counts to be waived. Moreover, the Defendant did not contest liability or point to any evidence in the record that would preclude liability under Count I (Fraudulent Transfer - - 11 U.S.C. § 548). It is incontrovertible that the Debtor acted to hinder, delay, and defraud his creditors by using the Defendant's Salem Five passbook savings account and Eastern Bank Money Market account to conceal his income from the reach of his creditors. By using the Defendant's account and Chase Sapphire MasterCard, the Debtor could and did hide his sizeable income from his creditors and used cash or other forms of payment to satisfy his mortgages, travel expenses and other obligations for years. Taking advantage of his parents' advanced age and failing health, the Debtor engaged in a scheme to defraud his creditors by shielding at least $773,944.50 from their reach.

Although the Debtor deposited his income and expense reimbursement income into the Defendant's accounts, he used the accounts and the credit card as if they were his own. Accordingly, he withdrew $761,622.76 from the accounts for his personal use and payment of the Chase Sapphire MasterCard. While the estate was depleted by the Debtor's fraudulent transfers, the financial condition of the bankruptcy estate was restored by the prepetition repayments of the fraudulent transfers. Thus, while the Trustee may avoid the fraudulent transfers, he may not

19

recover their full value.  Rather, he is entitled to $12,321.69, the amount by which the estate was not restored to the same position as it would have been if the transfers had not been made.  *See* In re Patts, 470 B.R. at 243; In re Pearlman, 515 B.R. at 896-97 (footnotes omitted).

The Trustee also seeks to recover the amount of credit card payments attributable to the Debtor's practice of paying the Chase credit card monthly balance in full.  Because the Defendant and his spouse also used the credit card, the estate was not restored by sums attributable to the charges they made for gasoline and restaurant meals, which the Debtor indicated averaged about $500 per month.  The Court agrees that the Trustee is entitled to recover those sums for payments made during the two-year period prior to the commencement of the Debtor's bankruptcy estate.

Finally, the Trustee seeks to recover from the Defendant all cash withdrawals which total $264,034 because, in his view, there was insufficient evidence that money was spent for the benefit of the Debtor.  The Defendant, through the Debtor's deposition, produced evidence that the Debtor used cash to pay his mortgages and other personal expenses.  The Trustee submitted no evidence to rebut that evidence. There was no evidence that the Defendant and his spouse altered their lifestyle to reflect an infusion of substantial cash, acquired any assets that they previously did not have, opened other bank accounts or formed trusts or other entities to hold the substantial amounts of cash.  Accordingly, the Court rejects the Trustee's claim to the amount of cash withdrawals.

In conclusion, the Court rejects the Trustee's argument that reliance on In re Patts nullifies Bankruptcy Code provisions that create a defenses to a fraudulent transfer actions under 11 U.S.C. §§ 548(c) and 550(b)(1).  The defense under § 548(c) was not raised by the Defendant and § 550(b) does not pertain to initial transferees. More significantly, the issue addressed by Patts which is pertinent to this proceeding is the extent of harm to the bankruptcy estate.  A judgment in the full amount of the Debtor's deposits would result in a windfall to the bankruptcy estate and cause incalculable harm to the Defendant.

## V. CONCLUSION

In view of the foregoing, the Court shall enter a judgment in favor of the Trustee on Counts I and III of his Complaint in the sum of $12,321.69, plus the amount of Chase Sapphire MasterCard charges attributable to charges made by the Defendant and his spouse between August 1, 2010 and August 1. 2012.  The Court shall enter a judgment in favor of the Defendant and against the Plaintiff on Counts IV and V.  The Plaintiff waived Count II of his Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  March 29, 2016